# Case No. 9,080.

## The MARIANNA FLORA.

### [3 Mason, 116.] [1]

### Circuit Court, D. Massachusetts. Oct. Term, 1822.[2]

#### CAPTURE AT SEA—MISTAKE—DAMAGES.

1. Case of capture or mutual combat by mistake.

2. Where a capture is lawful, the subsequent bringing in of the captured vessel is not a cause for giving damages.[2]

This was an appeal from a decree of the district court on the libel of the Portuguese ship Marianna Flora, by Robert F. Stockton, commander of the United States ship of war, the Alligator, in behalf of himself and his officers and crew; Philip Marett, the Portuguese vice consul, and Vertura Anacleto De Britto, being claimants and respondents in behalf of the owners of the Marianna Flora and cargo. The principal facts in the case were these: On the morning of the 5th day of November, 1821, the United States schooner Alligator, whilst on a cruise to the coast of Africa, commanded by Lieut. Stockton, fell in with a large vessel, apparently in distress, and which, when first perceived, was judged to be about nine miles from the Alligator; she was supposed, by the officers on board of the Alligator, to be in distress, from the circumstance of her lying to shortly after she was first perceived, and from her having

---

[1] [Reported by William P. Mason, Esq.]
[2] [Affirmed in 11 Wheat. (24 U. S.) 1.]

apparently a flag hoisted half mast high. Lieut. Stockton made inquiries of the purser of his vessel as to the quantity of provisions on board, and said he would move towards her and see what she wanted, and the course of the Alligator was accordingly changed to the direction of the strange sail. When the Alligator had arrived within gun shot of the latter, a gun was fired from the latter, the shot of which fell at a considerable distance forward of the Alligator's bow. American colors, an ensign and pendant, were immediately hoisted on board of the Alligator. Another gun was very soon fired from the strange sail loaded with round and grape shot, upon which Lieut. Stockton directed the bow gun of the Alligator to be fired as soon as it could be brought to bear, which was done; immediately after, another gun was fired from the strange sail and was returned by one or two of the cannonades of the Alligator, which fell short of the other vessel. No more guns were fired from the Alligator until she got within musket shot of the other vessel, when Lieut. Stockton hailed her, which was only answered by another gun. Lieut. Stockton then ordered a broad side to be fired, which was done, after which he got upon the arms-chest where his person and uniform could be seen, and waved his hat and trumpet to prevent further hostilities, when two more guns were fired by the other vessel. After these were returned by several from the Alligator, the Portuguese flag was seen to be hoisted by the other vessel, upon which Lieut. Stockton ordered the firing to cease, and again hailed, and called upon the other vessel to send its boat on board the Alligator. He was answered by another gun, but before this could be returned by the Alligator, Lieut. Stockton had an opportunity of hailing several times more, and a boat came on board the Alligator with the mate of the other vessel and her papers and log-book. A boat was then despatched from the Alligator for the captain, who was brought on board. In answer to inquiries made of him by Lieut. Stockton, why he fired on the Alligator, bearing the flag of the United States, he replied in Portuguese, that he took her for a pirate, and his suspicions were strengthened because she did not affirm her flag; and he appealed to his papers to show that his vessel was a Portuguese merchantman. Lieut. Stockton replied, that he did not understand the papers, but should send him to the United States for examination. Capt. De Britto, the Portuguese master, protested against such a measure, and told Lieut. Stockton that he should consider him answerable for damages. All on board the Marianna Flora were put in irons, except the captain and two boys. Provisions were put on board her from the Alligator. Lieut. Abbot, of the Alligator, was appointed to take charge of her and conduct her to the United States, and on the 7th day of November she left the Alligator and proceeded on her way to the United States, ac-

cording to orders from Lieut. Stockton. It was satisfactorily proved by the evidence in the case, that the Marianna Flora was a Portuguese merchant ship, and was on her way from Bahia to Lisbon at the time of the capture.

Messrs. Blake and Webster, for libellants.
Messrs. Knapp and Prescott, for claimants.

STORY, Circuit Justice. This is a most distressing and calamitous case, in which a serious loss must be borne by one of two innocent parties. The facts and the general principles applicable to them have been discussed with so much fulness, accuracy, and ability, in the opinion [3] of the learned judge of the district court accompanying the record, that it is wholly unnecessary for me to go at large into the examination. In general I may say, that I concur in his views of the facts, and the only questions that occur for decision here, are questions of law lying in a very narrow compass.

The first question is, whether the capture was justifiable; and if so, then the next and most important is, whether there was good cause for sending the vessel in for judicial inquiry and examination. In a time of peace it is admitted, that the public ships of war of one nation have no right to search the ships of other nations upon the ocean. Every ship sails there with the unquestionable right of pursuing its own lawful business without interruption; but whatever that business may be, it is bound to pursue it in such a manner as not to violate the rights of others. This results from the necessary equality of nations upon the ocean in time of peace. The general maxim in such cases is, "sic utero tuo, ut non alienum laedas." In respect either to merchant ships or ships of war I do not know that there is any thing reprehensible in approaching each other at sea. Each has an equal right to the use of the ocean, and neither has any right to assert that the ocean within a certain distance, not essential for its own movements, is exclusively its own. In respect to ships of war which sail as in the present case under the authority of their governments, to arrest pirates and slave-dealers, the latter being in truth the worst and most detestable of pirates, there is no reason why they may not approach any vessels descried at sea, for the purpose of ascertaining their real character; and it is no just cause of offence, even if all nations had not a common interest in such humane and laudable enterprises, that they make an approach, unless the conduct of such ships of war betray a design to insult or injure those they approached, or to impede them in their lawful commerce. And merchant ships certainly may in like manner innocently approach each other, either for the purpose of information or to relieve their own distress, or to ascertain the

_____

[3] [Nowhere reported; not now accessible.]

probable character of strangers; and there is no breach of the customary observances or of the strict law of nations in such conduct. On the other hand it is as clear, that no vessel is, under such circumstances, bound to lay by, and wait the approach of other ships; she is at liberty to pursue her voyage in her own way, and to use all necessary precautions to avoid any suspected attack or sinister enterprise. Each party is, in short, left free to act according to his own reasonable discretion, taking care not to violate the rights of the other; and if any mischief is sustained by either party from accident or mistake and without any fault or negligence of the other, it is a common evil, to be borne by the unfortunate sufferer without redress. It is, in the phraseology of the common law, "damnum absque injuriâ," a damage without a wrong. If, therefore, two armed ships should happen to meet upon the ocean and approach each other, and finally commence a combat upon mutual mistake, and without any hostile intent or any want of reasonable care, no wrong is done by either, for which the other can justly claim a recompense, whatever may be the extent of the calamity inflicted. But if the attack be wanton or from gross negligence, the party who is in fault is bound to make the most ample remuneration. Such are the principles deducible from the maxims of general justice, independently of those derived from the laws that regulate maritime warfare.

Without doubt, pirates may be lawfully captured on the ocean by the ships of any nation, private or public; for they are the common enemies of all mankind, and as such, they are liable to the laws of war. And any piratical aggression or attack by an armed vessel belonging to any nation, or sailing under the protection of its regular flag subjects the offending vessel to the penalty of confiscation, in the same manner as if they are common pirates (see act 3d March, 1819, c. 76 [1 Stat. 510]); nor do I conceive that it is indispensable to constitute piracy, that there should be an intent of private gain, for if a piratical burning or sinking of a ship or murder of her crew should take place by freebooters on the sea, it would be as genuine piracy as if the primary object were immediate plunder. The act would exhibit a piratical and felonious intent, an intent to despoil the owner of his property, and to accomplish it by the murder of the crew. The murder would be adminicular to the robbery. But every hostile attack of one armed vessel upon any other in time of peace is not necessarily piratical. It may be by mistake or in necessary self-defence, or to repel a supposed meditated attack by pirates. It may be justifiable or excusable, and then there is no blame, or it may be under circumstances of manifest default, and then it carries with it responsibility in damages. If, however, an attack be not piratical, but is yet wanton and unprovoked, arising from gross fraud or revenge,

or abuse of power, it is a waging of private unauthorized war, and subjects the vessel if captured to the penalty of confiscation. For that penalty is ordinarily denounced against property taken in delicto, where the act is an offence against the law of nations. Such. I conceive, are the principles which are applicable to cases of this nature, springing from the general rights of nations upon the sea, and the duties resulting from their independence and amity.

In the present case, it appears to me that the contest arose from mutual mistake and misapprehension. There is no pretence to say that the Alligator approached the Marianna Flora with any hostile intention; she was induced to do so in the first instance by signals and manoeuvres, which were mistaken for indications of distress; and when the attack was commenced upon her, she had strong reasons to suspect the real character of the Marianna Flora, and at all events was entitled to repel a hostile attack by all the means in her power. The approach, even without these circumstances, was justifiable. It was in the performance of public duties confided to the commander by his government, and he might well wish to ascertain, as far as he might without violating the rights of other nations, whether the ships, met with in the course of his voyage, were engaged in lawful commerce, or in common piracy, or in the slave trade. If he did nothing more than approach, without indicating an intention to board or to attack the Marianna Flora, no law is to be found within my knowledge which imputes it to him as a fault or violation of duty, and I am as far from imputing any fault to the Marianna Flora. In the circumstances in which he was placed, her commander probably did suspect the Alligator to be a piratical cruiser, and whether he lay to or shortened sail before or after this supposed discovery, is immaterial, for he had an unquestionable right to prepare for his defence as soon as he thought that the danger was real. The first act of aggression was certainly on the side of the Marianna Flora. She had no right to prevent by force the approach of the Alligator if the latter was a lawful cruiser in amity. But the real character of the cruiser could not be known, and the firing upon her, while at a great distance, if it were wrong, was levissima culpa, and may fairly be construed as an indication of defensive resistance. It might justly inflame suspicion on the other side, but it was not decisive of meditated hostility, any more than of mistake, resulting from fear of pirates. Under these circumstances I agree entirely with the district judge in the conclusion, that the capture by the Alligator was lawful; and that her commander was in no fault for resisting an attack made upon him under no just provocation. If, indeed, there was any blame, it was in the first attack by the Marianna Flora; because she had no right to apply force, unless in self-defence, and where the circumstances

admitted of no reasonable doubt of a hostile or piratical attack.

If the capture was lawful, the next question is, whether Lieut. Stockton was justified in sending in the Marianna Flora for adjudication. It was argued that there was no probable cause for sending her in, and if there was, that probable cause forms no justification except in cases of the exercise of belligerent rights on the ocean. In other cases of marine seizures, it is said the party can only justify himself by the event of condemnation. I am not aware that any such doctrine has been judicially settled. The cases of Murray v. The Charming Betsy, 2 Cranch [6 U. S.] 64, Little v. Barreme, Id. 170, and Maley v. Shattuck, 3 Cranch [7 U. S.] 458, which have been relied on at the bar, establish no such doctrine; for in each of these cases the court came to the conclusion, that there was no probable cause of capture. As far indeed as they go, they lead in the opposite direction, for the seizures in those cases were made under our non-intercourse acts against France. Act 27 Feb. 1800, c. 10 [2 Stat. 7]; Act 9 Feb. 1799, c. 108 [1 Story, Laws, 588 (1 Stat. 611, c. 2)]; Act 13 June, 1798, c. 70 [1 Story, Laws, 508 (1 Stat. 565, c. 53)]. So far from the court having undertaken to decide that probable cause would not have justified the capture, the judgments proceed upon the tacit assumption that it would, and limit the inquiry to the simple fact; and in the case of The St. Louis, 2 Dod. 210–264, where the seizure of a French ship in time of peace for traffic in the slave trade was held a marine trespass, Sir William Scott expressly overruled the claim for damages upon the ground, that the question was of the first impression. The court, therefore, in the present state of judicial opinions on this subject, is not called upon to admit, that probable cause would be no justification.

It is the less necessary in this case to sift that doctrine, because here there was not only probable cause, but justifiable cause of capture. The Alligator had a perfect right to resist the attack and to subdue a vessel acting as an enemy. And if this be so, where is the case which decides that a justifiable capture becomes tortious by sending in the vessel for adjudication? If in the combat any persons had been killed on board of the Alligator, it would have been a matter of absolute duty to have sent in the vessel for the deliberate consideration of the government, in what manner to deal with the parties to the aggression. If any persons had been killed on board of the Marianna Flora, it would have been an act of great prudence to have sent her in, that the government might have had an opportunity in their own courts to have ascertained the fact and the truth of the vindication from the very parties in interest, flagrante facto. It was not even denied in the argument, that cases of this sort might have authorized the act, and they differ not in nature but in degree only from that before the court. I do not say, that under all the circumstances it might not have been fit for Lieut. Stockton to have dismissed the Marianna Flora without further inquiry. Judging from the lights now before the court, that would certainly be my own opinion, because there were strong reasons to believe, that the attack was not hostile. But we are to consider that this is not the case of a private ship of war. Lieut. Stockton held the commission of the government, and his vessel bore the national flag. The attack was an indignity to that flag. It was a trespass upon the sovereignty of the nation, unintentional indeed, as the court now believes, but still it was a trespass. If the government should choose to seek any redress, it could be had against the vessel in our own ports only. If it should choose deliberately to investigate the circumstances, it had a perfect right to institute a judicial inquiry. Lieut. Stockton might therefore have justly thought, that in a case confessedly new in its character, he was not bound to take upon himself the responsibility of a final decision; that it was more compatible with his own honour and with that of the nation, as well as with the rights of the other party, to submit the whole to the judgment of a legal tribunal. If he thought, and that certainly appears to have been his impression, that the attack was wanton and piratical, the duty of sending in became almost peremptory. Certainly if there had been no probable cause of capture, this would not have justified him, but as the capture was justifiable, it takes off all pretence that his conduct was malicious or oppressive. Lieut. Stockton might have released the vessel; but the question upon which damages depends is, whether he was bound so to do. In a case of such novelty and responsibility I cannot say that he was bound so to do, or that his mistake in not doing it binds him to damages. I adopt in this respect the doctrine of Sir William Scott in the St. Louis. The question here, as there, is primae impressionis; the case here, as there, is the first of its kind. The nature of the attack could not be absolutely ascertained, in a manner free from doubt on the ocean, and the law arising out of it was certainly of no easy interpretation. If there be any case in which the admiralty has given damages for sending in a vessel for adjudication, where the capture was justifiable, it has escaped my notice. I do find that damages have been sometimes refused even where the capture was a marine tort. I am not for making the hard duty of a public officer in the exercise of his discretion (compelled as he often is to decide suddenly upon emergencies) more hard by inflicting damages, unless the law has imposed upon me that duty. In this case I cannot come to the conclusion that such is my duty; and therefore with the greatest respect for the opinion of the learned judge of the district court, I feel myself compelled to reverse his decree as to damages, which, I understand, is the only part of his decree appealed from,

restitution having been acquiesced in after the first decree. Under all the circumstances each party ought to bear his own costs.

I am not sorry that the amount in controversy will enable the highest tribunal to revise the present decision, and to correct any errors into which I may have fallen.

[On appeal to the supreme court the decree of the circuit court was affirmed, without costs to either party. 11 Wheat. (24 U. S.) 1.]